UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

CHRISTOPHER L. SCRUGGS,

    Plaintiff,

    v.                                        CAUSE NO. 3:22-CV-120-JD-SJF

T. PULLINS, et al.,

    Defendants.

## OPINION AND ORDER

Christopher L. Scruggs, a prisoner without a lawyer, proceeds in this case on the following claims:

    (1) An Equal Protection claim against T. Pullins, A. Watts, Warden Galipeau, T. Cornett, J. Kennerk, and Commissioner Robert E. Carter, Jr., for treating him differently than similarly situated individuals by denying him a tablet device without a rational basis;

    (2) An Equal Protection claim against T. Pullins, A. Watts, Warden Galipeau, T. Cornett, J. Kennerk, and Commissioner Robert E. Carter, Jr., for treating him differently than similarly situated individuals by denying him a tablet device by denying him a tablet based on his race;

    (3) A First Amendment claim against T. Pullins, A. Watts, Warden Galipeau, T. Cornett, J. Kennerk, and Commissioner Robert E. Carter, Jr., for denying him access to information provided on tablet devices with no reasonable relationship to legitimate penological interests; and

    (4) An injunctive relief claim against Warden Galipeau to receive a tablet device to the extent required by the Equal Protection Clause and the First Amendment.

ECF 14.

On May 27, 2025, Warden Galipeau, Cornett, Kennerk, and Commissioner Carter, moved for summary judgment on all claims against them. ECF 164. On the same day, Pullins and Watts similarly moved for summary judgment. ECF 168. In his response, Scruggs expressly waives the injunctive relief claim and any claims against Commissioner Carter. ECF 192-3 at 2-3. The court accepts the waiver of these claims and will focus on the arguments on the remaining claims and defendants below.

## FACTS

The Indiana Department of Correction and ViaPath Technology[1] entered into a contract to "provide access to a tablet for every eligible inmate," assigning ViaPath Technology the duty to supply the necessary quantity of tablets. ECF 106 at 24-34. BCForward is a subcontractor for ViaPath Technology. ECF 168-2. At all times relevant, Pullins and Watts were employees of BCForward who worked at the Westville Control Unit. *Id.* Their job duties consisted of issuing ViaPath tablets to inmates at the direction of the IDOC and assessing the tablets for damage and repairs. *Id.* Cornett served as a unit team manager, and Kennerk served as a caseworker. ECF 164-3, ECF 164-4.

With respect to the issuance of tablets, Cornett attests as follows:

During the period relevant to this matter, Correctional Sergeant Ladawn Brown handled incarcerated individuals' tablet devices in the Receive and the Release intake area at Westville Correctional Facility. Site Administrator staff for a subcontractor of ViaPath Technology (formerly GTL) would supply tablet devices ready for pickup. During the period relevant to this matter, incarcerated individuals' tablet devices were both preassigned to them and preprogrammed with any information or content

---

[1] According to the defendants, ViaPath Technology was formerly known as Global Tel*Link Corporation.

2

> specific to the corresponding incarcerated individual by the time that they were given to facility staff for distribution.

ECF 164-3. A BCForward supervisor attests that, "[while BCForward employees] assist in issuing tablets, IDOC staff in charge of issuing the tablets to inmate offenders when inmates are transferred to the facility. IDOC then provide tablet user agreements to offenders, which are signed and returned prior to tablet issuance." ECF 168-2.

During the relevant period, the Westville Correctional Facility had about 200 tablets fewer than needed to fill orders for inmates. ECF 94 at 3. Warden Galipeau understood from communications with ViaPath and BCForward that the shortage was caused by "supply chain and supply-and-demand issues." ECF 164-2. According to the BCForward supervisor, "[Pullins and Watts] are not responsible for ensuring there are enough Tablets." ECF 104 at 1-2. "Rather, inventory is determined by a variety of factors [outside of their control], including, but not limited to: ViaPath fulfilling Return Material Adjustment ("RMA") tickets and corporate policy, contractual requirements, inmate's personal handling of tablets to ensure that they are not destroyed and can be put back into circulation once returned to the facility, jail staff submitting damaged tablets for review, shipping processes performed by third party vendors, and inmates losing tablets that prevent an RMA from being opened." *Id.*

On October 15, 2021, Scruggs arrived at the Westville Correctional Facility following a transfer from the Wabash Valley Correctional Facility. ECF 164-1 at 12. On October 21, 2021, Kennerk told Scruggs that he was on the "GTL list"" for receiving a tablet and that it could be several months before he would receive one. ECF 116-3 at 4.

3

On October 24, 2021, Scruggs submitted a grievance complaining that he had not received a tablet and that someone had told him it would take six months to order new tablets. ECF 116 at 2. On November 18, 2021, the grievance officer responded, "Tablets are provided by GTL, a private contractor, and therefore are beyond the control of the DOC. In addition, tablets are a privilege, not a right. Participation is voluntary. Tablets are issued as they come available. At this time, there is a shortage of new and re-issued tablets." *Id.* at 1.

On February 21, 2022, Scruggs submitted a grievance, stating as follows:

> I got here on October 15, 2021, and I have not been given a tablet, to which I filed a lawsuit on 2-9-22, which this facility did not file until 2-14-22. On 2-15-22, Ms. Cornett (WCU Unit Team Manager) told me that she has my tablet and that it was given to me, and I was on a hunger strike at the time. So on 2-16-22, I was called out to Capt. Lewis office where Ms. Cornett and Lt. Crittenton were also. These people all told me that I could not get my legal work nor tablet until I came off hunger strike. to withhold those things was a punishment for my right to strike a First Amendment violation. I further was placed in a receiving cell and told I would get nothing until I ate my tray. So I was forced off my hunger strike at which time I was only given my legal mail. All told me that because I went on a hunger strike I now could not get my GTL tablet because they don't want other inmates to think they had to go on hunger strikes and could get their tablet. I was further told that I now had to wait to get a tablet that was already here for me until everybody that did not have a tablet got theirs also. This is just some other reason to not give me a tablet because I filed a lawsuit and went on a hunger strike. No other person had to wait to get their tablet until all got their tablets. This is just things staff came up with to harass me.[2]

---

[2] In this grievance, Scruggs appears to contend that correctional officials retaliating against him for engaging in a hunger strike by declining to give him a tablet device in violation of his First Amendment rights. The court clarifies that such a claim is not a subject of this order because the court did not grant Scruggs leave to proceed on such a claim, nor is this incident referenced in the complaint. ECF 2, ECF 22.

4

ECF 192-4 at 10-11. At his deposition, Scruggs testified that Warden Galipeau was present at the meeting in Captain Lewis' office. ECF 164-1 at 17-18.

Scruggs received a tablet sometime between February 21, 2022, and March 9, 2022. ECF 88 at 40-41. He did not have to sign a user agreement when he received this tablet, though he had signed user agreements in 2019 and in 2021. ECF 68 at 5-6; ECF 187-1 at 21.

Scruggs also attests as follows:

> There were 2 white inmates that was on the B-6 range with me that received their tablets in about 3 weeks. There was even one white person that received his tablet in 2 days after telling Ms. Cornett that someone died in his family and that it was causing him to have mental health issues. Further, Scruggs knows of 2 other white inmates that were receiving tablets out of order. However, I don't know their names or room location, as they were on another of the B-Pod ranges.

ECF 192-4 at 6-7. On February 9, 2022, Scruggs wrote to Watts and Pullins representing that staff had "given tablets to white inmates that [had] only been there since Dec.," and Pullins responded, "We don't handle incoming offender tablets." ECF 187-1 at 18. On February 15, 2022, Scruggs wrote to Cornett, stating, "Furthermore, this white inmate did just get his tablet although he was only here five weeks at the time. He got here around December 27, 2021, and is in room WCU-136-203. He said that he got to the front of the line by having his family call and because he tried to kill himself." ECF 192-4 at 13.

## STANDARD OF REVIEW

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

5

Civ. P. 56(a). A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Not every dispute between the parties makes summary judgment inappropriate; "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* In determining whether summary judgment is appropriate, the deciding court must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Ogden v. Atterholt*, 606 F.3d 355, 358 (7th Cir. 2010).

## DISCUSSION

### Personal Involvement

Scruggs argues that the defendants are liable for the shortage of tablet devices at the Westville Correctional Facility and for skipping over him on a list of inmates awaiting tablet devices. The defendants argue that they were not personally involved in these decisions. Construing the facts in the light most favorable to Scruggs, the relevant period of time is between the date of Scruggs' arrival at the Westville Correctional Facility on October 15, 2021, and the date he received a tablet on March 9, 2022. A third significant date is February 15, 2022, on which correctional staff advised Scruggs that they had a tablet device for him but declined to immediately give it to him in an effort to discourage hunger strikes.

Section 1983 requires a plaintiff to show more than just a violation of a constitutional right. To recover damages from a defendant, he must also prove that

defendant was personally involved in the violation. *See Kuhn v. Goodlow*, 678 F.3d 552, 555-56 (7th Cir. 2012) ("§ 1983 liability is premised on the wrongdoer's personal responsibility"); *see also Wolf-Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir. 1983) (a defendant cannot be liable without "a showing of direct responsibility for the improper action[.]"). This is because there is no general *respondeat superior* liability under 42 U.S.C. § 1983. *Burks v. Raemisch*, 555 F.3d 592, 596 (7th Cir. 2009). As such, "public employees are responsible for their own misdeeds but not for anyone else's." *Id.* "Only persons who cause or participate in the violations are responsible." *George v. Smith*, 507 F.3d 605, 609 (7th Cir. 2007). As explained by the Seventh Circuit:

> Public officials do not have a free-floating obligation to put things to rights, disregarding rules (such as time limits) along the way. Bureaucracies divide tasks; no prisoner is entitled to insist that one employee do another's job. The division of labor is important not only to bureaucratic organization but also to efficient performance of tasks; people who stay within their roles can get more work done, more effectively, and cannot be hit with damages under § 1983 for not being ombudsmen. Burks's view that everyone who knows about a prisoner's problem must pay damages implies that he could write letters to the Governor of Wisconsin and 999 other public officials, demand that every one of those 1,000 officials drop everything he or she is doing in order to investigate a single prisoner's claims, and then collect damages from all 1,000 recipients if the letter-writing campaign does not lead to better medical care. That can't be right. The Governor, and for that matter the Superintendent of Prisons and the Warden of each prison, is entitled to relegate to the prison's medical staff the provision of good medical care. That is equally true for an inmate complaint examiner.

*Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009).

The court first considers the period of time between Scruggs' arrival in October 2021 and February 15, 2022, when a tablet device had been prepared but withheld from Scruggs. The record indicates that, during this time, correctional staff did not have a

7

tablet device that had been prepared for Scruggs. The record contains no indication that Kennerk or Cornett had the ability to increase the supply of tablet devices or to alter the order in which tablet devices were prepared for inmates. Kennerk and Cornett may have handed tablet devices to other inmates, but those tablet devices were specifically prepared by other individuals for particular inmates other than Scruggs. Scruggs argues that Cornett obtained a tablet device for another inmate with severe mental health problems, but the fact that that inmate spoke with Cornett prior to receiving a tablet device does not demonstrate that Cornett either caused that inmate to receive the tablet device sooner or that she had the ability to control the order in which tablet devices were prepared.

Nor does it appear that Kennerk or Cornett had any control over the list or over whether tablet devices were ordered and prepared in accordance with the list. The record does not appear to include this purported list, but it suggests that Sergeant Brown, a non-party, maintained this list and instructed Pullins and Watts to prepare tablet devices for particular inmates. The record suggests that, at most, Kennerk and Cornett may have been able to add inmates to the list, but Scruggs does not contend that Kennerk and Cornett failed to add him to the list.

Scruggs further suggests that Kennerk and Cornett were personally involved with delaying his receipt of a tablet device because they did not give him a user agreement to sign. Though user agreements may be generally required for tablet devices, the record contains no indication that the lack of a user agreement had any impact on the timing of when Scruggs received a tablet device. To the contrary, Scruggs

8

attests that he did not have to sign a user agreement to receive the tablet device on or around March 9, 2022. Further, as Scruggs concedes, "this form would have been given to Scruggs at the time he received his tablet, thus Scruggs not signing an agreement would not have any relevance here." ECF 187-1 at 21.

Given his status as the warden, Warden Galipeau likely had the ability to modify the list or to ensure that the individuals under his supervision, like Sergeant Brown, followed it. However, these probable abilities, by themselves, are not enough to demonstrate his personal involvement. *See Matthews v. City of E. St. Louis*, 675 F.3d 703, 708 (7th Cir. 2012) ("To show personal involvement, the supervisor must "know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see."). Scruggs represents that he spoke with Warden Galipeau and submitted grievances relating to the tablet device, but the record contains no evidence that Scruggs specifically conveyed his concern that he should have received a tablet device before other inmates to the Warden or that Warden Galipeau was otherwise involved with the order of tablet distribution. With respect to the shortage of tablet devices, the contract between the IDOC and ViaPath delegated the responsibility of supplying tablet devices to ViaPath, and Warden Galipeau was entitled to relegate such decisions to ViaPath.

With respect to Pullins and Watts, the record contains no indication that they were responsible for ordering new tablet devices. While the contract delegated the supply of tablet devices to ViaPath, the record contains no evidence that the specific duties of Pullins and Watts included ordering new tablet devices. To Scruggs' point,

9

their duties included assessing tablet devices for repairs, so their actions might have had some effect on the supply of tablet devices. However, the record contains no indication that they violated Scruggs' constitutional rights or even demonstrated a lack of diligence in connection with the repair process.

Pullins and Watts likely had some control over the order in which they prepared tablet devices for particular inmates, but there is no indication that they deviated from their instructions from correctional staff. Significantly, Scruggs appears to argue that Pullins and Watts deviated from a purported list without providing that list or even a meaningful description of it. He also appears to assume that the list is based on the order at which inmates arrived at the Westville Correctional Facility, but nothing in the record suggests that that was the primary or only factor considered by correctional staff when considering the order of tablet device distribution. The record similarly lacks any information as to how or when Pullins and Watts were instructed to prepare a tablet device to Scruggs.

As mentioned above, the record indicates a material change in circumstances on February 15, 2022, the date when correctional staff informed Scruggs that they had a tablet device for him. Notably, Scruggs contends that the defendants obtained a tablet device for him only because he had filed the complaint in this case one day earlier. According to Scruggs, this sequence of events indicates that the defendants had the ability to obtain a tablet device for him in a single day. Scruggs appears to make a suspicious timing argument, but "[s]uspicious timing alone will rarely be sufficient to create a triable issue because suspicious timing may be just that—suspicious—and a

suspicion is not enough to get past a motion for summary judgment." *Manuel v. Nalley*, 966 F.3d 678, 681 (7th Cir. 2020).

Moreover, the timing here is not particularly suspicious. It is unclear from the record how any defendant could have had personal knowledge that Scruggs had filed a lawsuit against them as of February 14 or February 15, 2021. But even if they knew, it is also unclear why the defendants would have responded to the lawsuit by quickly preparing a tablet device for him only to then withhold the tablet device for an additional 6 to 22 days. Consequently, no jury could reasonably infer that the defendants had the ability to provide Scruggs with a tablet device prepared for him within a single day based on this sequence of events. Therefore, the court finds insufficient evidence to show that any of the defendants were personally involved in failing to give Scruggs a tablet prior to February 15, 2022.

On or around February 15, 2022, correctional staff advised Scruggs that they had a tablet device for him but declined to immediately give it to him in an effort to discourage hunger strikes. The record indicates that Cornett personally told Scruggs about this decision and that Warden Galipeau was present at the meeting at which this occurred. However, the record contains no indication that Kennerk, Pullins, or Watts had any involvement with Scruggs' tablet device after it had been prepared and given to correctional staff. Consequently, the court will grant summary judgment in favor of Kennerk, Pullins, and Watts on all claims. The court will discuss below whether the actions of the remaining defendants between February 15, 2022, and March 9, 2022, amount to constitutional violations.

11

Equal Protection Claims

Scruggs asserts equal protection claims against Warden Galipeau and Cornett, for treating him differently than similarly situated individuals by denying him a tablet device without a rational basis and based on his race. "The Equal Protection Clause of the Fourteenth Amendment prohibits state action that discriminates on the basis of membership in a protected class or irrationally targets an individual for discriminatory treatment as a so-called 'class of one.'" *Reget v. City of La Crosse*, 595 F.3d 691, 695 (7th Cir. 2010) "Prison classifications are presumed to be rational and will be upheld if any justification for them can be conceived." *Id.* To uphold governmental conduct under rational basis review, the court "need only find a reasonably conceivable state of facts that could provide a rational basis for the classification." *Indiana Petroleum Marketers & Convenience Store Ass'n v. Cook*, 808 F.3d 318, 322 (7th Cir. 2015). "If we can come up with a rational basis for the challenged action, that will be the end of the matter— animus or no." *Fares Pawn*, 755 F.3d at 845. "[T]he test for rationality does not ask whether the benign justification was the *actual* justification. All it takes to defeat the plaintiffs' claim is a *conceivable* rational basis for the difference in treatment." *D.B. ex rel. Kurtis B. v. Kopp*, 725 F.3d 681, 686 (7th Cir. 2013).

"To show a violation of the Equal Protection Clause, plaintiffs must prove that the defendants' actions had a discriminatory effect and were motivated by a discriminatory purpose." *Chavez v. Illinois State Police*, 251 F.3d 612, 635–36 (7th Cir. 2001). "To prove discriminatory effect, the plaintiffs are required to show that they are members of a protected class, that they are otherwise similarly situated to members of

12

the unprotected class, and that plaintiffs were treated differently from members of the unprotected class." *Id.* "Discriminatory purpose implies more than intent as awareness of consequences. It implies that the decisionmaker selected or reaffirmed a particular course of action at least in part because of its adverse effects upon an identifiable group." *Id.* at 645.

"To be considered similarly situated, comparators must be prima facie identical in all relevant respects, or directly comparable to plaintiff in all material respects." *Racine Charter One, Inc. v. Racine Unified Sch. Dist.*, 424 F.3d 677, 680 (7th Cir. 2005). "Indeed, it is clear that similarly situated individuals must be very similar indeed." *Id.* As of February 15, 2022, a material aspect of Scruggs was that he had recently engaged in a hunger strike for the purpose of obtaining a tablet device. Scruggs has identified no other inmate who received more favorable treatment than he did after recently engaging in a hunger strike for the stated purpose of obtaining a tablet device, so he has not identified a proper comparator.

Further, declining to immediately give a tablet device to an inmate who has engaged in a hunger strike - for the stated purpose of obtaining a tablet device - in an effort to discourage other inmates from similarly engaging in hunger strikes is rational; it is rational to presume an inmate with evidence that hunger strikes are not an effective negotiating tool would be less likely to engage in a hunger strike on his or her own. Additionally, there is no indication that Scruggs' race played any factor in Cornett or Warden Galipeau's decision to withhold the tablet device. Scruggs attests that Warden Galipeau called him "uppity" in December 2023 after Scruggs told him that he had

13

recorded Warden Galipeau's statements.[3] ECF 192-4 at 7. While the court understands the serious racial connotations associated with that term, no reasonable jury could conclude Warden Galipeau withheld a tablet device from Scruggs in February 2022 due to racial animus based on Warden Galipeau's use of that term one and a half years later.

In sum, the record indicates that Warden Galipeau and Cornett had a rational basis for declining to immediately give Scruggs a tablet device once one had been prepared for him on February 15, 2022. The record lacks any evidence that racial animus played any role in the decision of Warden Galipeau or Cornett, and Scruggs has not identified a proper comparator. Therefore, the court grants summary judgment in favor of Warden Galipeau and Cornett on the Equal Protection claims.

First Amendment Claim

Scruggs asserts a First Amendment claim against Warden Galipeau and Cornett for denying him access to information provided on tablet devices with no reasonable relationship to legitimate penological interests. "[A] prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S. 817, 822 (1974). "[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987).

---

[3] Scruggs does not provide a date for this comment but attests that it occurred before "Scruggs was given back 17+ years of DS time." ECF 192-4 at 7. He also cites *Scruggs v. Adams*, 3:24-cv-778 (N.D. Ind. filed Sept. 20, 2024), as a summary judgment exhibit. *Id.* at 14. According to Scruggs' complaint in that case, the reinstatement of disciplinary segregation occurred on December 29, 2023.

The Eighth Amendment requires that "prison officials must ensure that inmates receive adequate . . . medical care" and "must take reasonable measures to guarantee the safety of the inmates" *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) "The obligation to intervene covers self-destructive behaviors up to and including suicide." *Miranda v. Cnty. of Lake*, 900 F.3d 335, 349 (7th Cir. 2018). Consequently, correctional officials have a legitimate penological interest in dissuading inmates at the Westville Correctional Facility from engaging in hunger strikes, which is a type of self-destructive behavior. Further, declining to immediately satisfy Scruggs' demand for a tablet device after he had engaged in a hunger strike is reasonably related to that penological interest; it is reasonable to presume an inmate with evidence that hunger strikes are not an effective negotiating tool would be less likely to engage in a hunger strike on his or her own. Therefore, the court grants summary judgment in favor of Warden Galipeau and Cornett on the First Amendment claim. Because no claims remain against any defendant, the court will also direct the clerk to enter judgment in favor of the defendants and to close this case.

For these reasons, the court:

(1) GRANTS the motions for summary judgment (ECF 164, ECF 168); and

(2) DIRECTS the clerk to enter judgment in favor of the defendants and to close this case.

SO ORDERED on February 11, 2026

/s/JON E. DEGUILIO
JUDGE
UNITED STATES DISTRICT COURT

15